UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:                                    Case No. 3:14-bk-2892-JAF

MONTICELLO REALTY
INVESTMENTS, LLC,                         Chapter 11

    Debtor.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case came before the Court upon a confirmation hearing on Combined Disclosure Statement and Chapter 11 Plan filed by Monticello Realty Investments, LLC (the "Debtor") on September 27, 2014 (Doc. No. 45; the "Plan"), Debtor's Motion to Designate and Disqualify the Ballots of the Jacksonville Bank as Cast in Bad Faith (Doc. No. 58; the "Motion to Designate"), and Debtor's Objection to Claim No. 3 of The Jacksonville Bank (Doc. No. 60; the "Objection to Claim"). The Court conducted an evidentiary hearing on the matters on December 10, 2014. At the conclusion of the hearing, in lieu of oral argument, the Court directed the parties to submit post-trial memoranda in support of their respective positions. Upon the evidence and the applicable law, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

In March of 2003, The Jacksonville Bank (the "Bank") loaned $1,185,000.00 to Monticello Realty Investments, Inc. ("MRI Inc.") to finance MRI Inc.'s acquisition of the Norco Office Center at 580 Ellis Road, Jacksonville, Florida 32254 (the "Property"). (Tr. at 80–81). The Property is a Class C Commercial Property which consists of a 29,000 square foot office complex. (Tr. at 9). The Bank's loan to MRI Inc. was evidenced by a

promissory note (the "Note") and secured by a mortgage (the "Mortgage") executed by MRI Inc. in favor of the Bank. (Tr. at 80–81). On May 24, 2004, MRI Inc. transferred the Property to the Debtor, subject to the Mortgage. (Tr. at 82-83). The Bank's claim against the Debtor arises from the Debtor's guaranty of the Note and Mortgage (the "Guaranty"), which the Debtor executed when it took title to the Property. (Tr. at 83–84). The maturity date of the Note was March 26, 2008. (Bank's Ex. 18, Ex. A).

By a modification agreement dated March 26, 2008, the Note's maturity date was extended to March 26, 2013. (Bank's Ex. 18, Ex. J). By a modification agreement dated August 29, 2013, and made effective as of March 26, 2013, the Note's maturity date was extended to August 15, 2014. (Bank's Ex. 18, Ex. P). Debtor defaulted under the August, 2013 modification agreement. On November 21, 2013 the parties entered into another modification agreement. (Bank's Ex. 18, Ex. Q). The November 21, 2013 modification agreement permitted Debtor to make interest only payments for five months. At the time the parties entered into the August, 2013 and November, 2013 modification agreements, the Property had an occupancy rate of approximately 56%, the Debtor was delinquent on property taxes, and the Debtor had missed months of payments. Stephen Coates, the account manager for the Bank, explained that the Bank entered into the extensions because it wanted to give the Debtor an opportunity to get back on its feet and maintain its operation. (Tr. at 138-139). The Bank had the option of commencing a foreclosure proceeding or working with the Debtor and it chose to work with the Debtor. (Tr. at 139). Debtor immediately defaulted under the November 21, 2013 modification agreement. On May 5, 2014, the Bank instituted a foreclosure proceeding. (Bank's Ex. 18).

On June 13, 2014 (the "Petition Date"), the Debtor (but not MRI Inc.) filed a

voluntary petition under Chapter 11 of the Bankruptcy Code. (Tr. at 90–91).[1] On its bankruptcy schedules the Debtor valued the Property at $1.4 million. (Bank's Ex. 1). On June 25, 2014, the Debtor filed Emergency Motion for Authority to Use Cash Collateral (the "Emergency Motion") (Doc. 21), to which the Bank objected (Doc. 32). On July 10, 2014, the Court conducted a hearing on the Emergency Motion at which it granted the Emergency Motion on an interim basis and directed the parties to submit an agreed order. On August 21, 2014, the Court entered Interim Order Authorizing Use of Cash Collateral (the "First Cash Collateral Order"). (Bank's Ex. 2). Therein the Debtor acknowledged and agreed that, as of the Petition Date, it owed the Bank $850,054.38, which included $763,507.40 of principal, $42,481.98 of interest, $2,950.00 of appraisal costs, and $41,116.38 of attorney's fees and expenses. The First Cash Collateral Order set forth the parties' tentative agreement to restructure the Debtor's debt to the Bank. (Tr. at 93). The parties' agreement was expressly conditioned upon the Debtor's execution of new loan documents acceptable to the Bank. (Tr. at 97). The First Cash Collateral Order provided as follows:

    i.    The Debtor's obligations to the Bank "shall be evidenced by new loan documents (to be negotiated between the Debtor and the Bank and attached as exhibits to the Plan) which shall provide for:" (a) $763,507.40 of the Bank's secured claim to be repaid at 5.25% interest amortized over 30 years, subject to a balloon payment in five years and (b) the balance of the Bank's secured claim not to exceed $144,718.24 to be paid at 6.5% interest only, subject to a balloon payment in five years. (Bank's Ex. 2, ¶ 11);

    ii.    The First Cash Collateral Order "shall not constitute evidence concerning … the terms of the Debtor's plan of reorganization in the event the Debtor and the Bank are unable to agree on the terms of the New Loan Documents to be attached to the Plan." (Bank's Ex. 2, ¶ 21); and

---

[1] While the Petition stopped the foreclosure proceeding as to the Debtor, the Bank obtained money judgments against Hank Dean and Tommy Dean, guarantors of the Note.

    iii.    The First Cash Collateral Order "shall not be deemed to modify any of the terms or conditions of [the Bank's] [e]xisting [l]oan [d]ocuments" (which existing documents require all modifications to be in writing) (Bank's Ex. 2, ¶ 18; Tr. at 94- 96).

In September of 2014, the Bank provided the Debtor with drafts of two promissory notes, a mortgage and a proposed confirmation order containing terms consistent with the frame-work outlined in the First Cash Collateral Order. (Tr. at 98–99). According to Mr. Coates, the new loan documents were standard bank loan documents containing typical loan terms. (Tr. at 98- 99). The Debtor responded by proposing revisions to the new loan documents that were unacceptable to the Bank. (Tr. at 99–100). The Debtor proposed to eliminate (i) the Debtor's obligation to pay property taxes on the Property, (ii) the Debtor's obligation to maintain insurance on the Property, (iii) cross-default provisions between the two promissory notes, (iv) a cross-default provision between the promissory notes and the mortgage, (v) the Debtor's obligation to pay the Bank's attorneys' fees and appraisal expenses and (vi) the due-on-sale provision. (Tr. at 100–102). At some point, negotiations between the parties broke down. The parties did not execute new loan documents. (Tr. at 62-63).

On September 27, 2014, the Debtor filed the Plan without any new loan documents attached. Instead, the Plan provided that the Debtor would (i) repay $910,177.69 to the Bank (Bank's Ex. 3, § 3.3a; Tr. at 105-106) and (ii) "enter into a new mortgage and new promissory notes" which the Debtor would file with the Court "on or prior to the Confirmation Hearing." (Bank's Ex. 3, § 3.3a).

On September 29, 2014, the Court entered Second Interim Order Authorizing Use of Cash Collateral (the "Second Cash Collateral Order"). Like the First Cash Collateral

Order, the Second Cash Collateral Order provided that the parties' tentative agreement to restructure the Debtor's debt to the Bank was conditioned upon the execution of new loan documents. (Bank's Ex. 4, ¶ 13). According to Mr. Coates, that provision was important to the Bank because it was "unwilling to have the terms that relate to the notes unsupported by loan documents which protected [its] collateral and provided routine and customary rights and remedies." (Tr. at 108).

On October 1, 2014, the Court entered Order Conditionally Approving Disclosure Statement, Scheduling Confirmation Hearing, and Fixing Deadlines. (Doc. 47). The Court scheduled the confirmation hearing for November 3, 2014. On October 13, 2014, the Bank filed Claim 3 as a secured claim in the amount of $850,054.38 as of the Petition Date. (Bank's Ex. 5). On that same day, Independent Bankers Bank, ("TIB"), a credit card company, filed an unsecured claim in the amount of $41,868.20 (the "TIB Claim"). On October 15, 2014, the Bank purchased the TIB Claim. (Bank's Ex. 7). Mr. Coates testified that the Bank purchased the TIB Claim to ensure that the Debtor would not attempt to confirm the Plan over the Bank's objection in the event the parties could not agree on new loan documents. (Tr. at 108-109).

Mr. Coates explained the following consequences to the Bank if the Plan was confirmed without customary loan documents:

> Well, it's significant. It's well known banks are regulated by various authorities. The FDIC routinely examines us, and if they were to see the loan documents that had the exclusions that were proposed by the Debtor, this credit until its maturity would be adversely rated due to the lack of a cross default for nonpayment of taxes, together with the Debtor's history of not paying taxes. In fact, the bank had to advance taxes for '08 and '09 in addition to the delinquent taxes in '13. We would perhaps even have to set up additional reserves

5

> notwithstanding the value of the collateral as we understand it today. So it would continue to be adversely rated, a cited asset included in our nonperforming numbers that report to shareholders with the cost of that capital set aside.

(Tr. at 127-128).

The Plan consists of the following classes of claims and interests: 1) Class 1-§ 507(a)(3) or § 507(a)(4) priority claims; 2) Class 2-Ad valorem property taxes; 3) Class 3-the Bank's secured claim; 4) Class 4-general unsecured claims; 5) Class 5-the TIB claim; and 6) Class 6-equity interests. (Bank's Ex. 3, § 2).

The Plan proposes to treat the Bank's secured claim by bifurcating it into two new notes in the amounts of $763,507.40 ("Note A") and $146,670.29 ("Note B"; collectively with "Note A", (the "New Notes")). The New Notes would restructure $910,177.69[2] into (i) a 5.25% loan in the amount of $763,507.40 amortized over 30 years (Note A), and (ii) a 6.5% non-amortizing, interest only loan in the amount of $146,670.29 (Note B). (Bank's Ex. 3, § 3.3a). The New Notes would mature in five years. (Id.)

The Plan proposes to treat the $17,752.00 unsecured claim of Guardian Commercial Real Estate, Inc. ("Guardian") by bifurcating it as follows:

a. $12,475.00 is treated as a priority Claim under Class 1, paid in ten monthly payments of $1,247.50 beginning in April 2015 (Bank's Ex. 3, § 3.2a); and

b. The $5,277.00 residual ($17,752.00 less $12,475.00) is treated as a general unsecured claim in Class 4. "[E]ach holder of an Allowed Claim in Class 4 will be entitled to receive in satisfaction of its Allowed Class 4 Claim a Pro Rata Share of a lump sum payment of $2,500 to be made in April 2015." (Bank's Ex. 3, § 3.3b).

---

[2] The Bank alleges it is owed $999,728.62 as of December 8, 2014.

The Plan also proposes to make a single payment of $500.00 to Class 5, the TIB Claim. (Bank's Ex. 3, § 3.3c).

Scott Foster, the Debtor's manager, testified that the Plan classified and treated Guardian as it did because Guardian is a necessary participant in the success of the Plan, the Debtor must have a good relationship with the real estate brokerage community, and the Debtor would not have a good reputation in that community if it did not pay the commissions. (Tr. at 37-38). The Debtor's justification for making a nominal payment on the TIB Claim was that (i) the TIB Claim was based on a credit card debt personally guaranteed by Henry Dean and Thomas Dean and (ii) TIB, as the initial holder of the TIB Claim, had not expressed an interest in settlement because it intended to seek repayment from the guarantors and did not want to get involved in "messy" bankruptcy negotiations. (Tr. at 39-40). However, Mr. Coates testified that in an attempt to collect on the judgments it obtained against Henry and Thomas Dean, the Bank discovered that the Deans have very little capacity to repay any debt and it does not believe the guarantees are meaningful. (Tr. at 120).

## Conclusions of Law

The Debtor seeks to have the Court designate and disqualify the Bank's ballots from being tabulated for purposes of confirmation. The Debtor objects to Claim 3 and contends that Claim 3 should be allowed as a secured claim in the amount of no more than $889,229.26 as of January 31, 2015. Finally, the Debtor seeks confirmation of the Plan.

### I. Designation of the Bank's Ballots

The first issue before the Court is whether the Bank's ballots should be designated and disqualified from being tabulated for purposes of confirmation. A creditor's right to

7

vote on a plan is a fundamental right under Chapter 11. In re Adelphia Commc'ns Corp., 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006). However, § 1126(e) of the Bankruptcy Code permits bankruptcy courts to designate a creditor's vote and provides that "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." 11 U.S.C. § 1126(e). The consequence of such designation is that the vote is disregarded in the counting of votes to determine whether a class has accepted or rejected the Plan. 11 U.S.C. § 1126(c).

Because the designation of a creditor's vote is a drastic remedy, it is the exception rather than the rule. In re Adelphia, 359 B.R. at 61. Section 1126(e) does not define the phrase "not in good faith." Congress left that task to the courts. "[G]ood faith in casting a vote does not require of the creditor a selfless disinterest. Each creditor is expected to cast his vote in accordance with his perception of his own self-interest, but he may not act with an ulterior or coercive purpose." In re Fed. Support Co., 859 F.2d 17, 19 (4th Cir. 1988). "[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked." In re Landing Assocs., Ltd., 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993). However, "'[a]s long as a creditor acts to preserve what he reasonably perceives as his fair share of the debtor's estate, bad faith will not be attributed to his purchase of claims to control a class vote.'" In re Figter Ltd., 118 F.3d 635, 639 (9th Cir. 1997) (quoting In re Gilbert, 104 B.R. 206, 217 (Bankr. W.D. Mo. 1989)). "Badges of bad faith" which may justify disqualification include efforts to: 1) assume control of the debtor; 2) put the debtor

8

out of business or otherwise gain a competitive advantage; 3) destroy the debtor out of pure malice; and 4) obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize. In re DBSD North America, Inc., 421 B.R. 133, 138 (Bankr. S.D.N.Y. 2009).

The Debtor asserts that the Bank acted in bad faith because it sought to dictate the terms of new loan documents, ceased negotiating new loan documents months before the December 15, 2014 expiration of the Second Cash Collateral Order, and immediately thereafter "embarked on its claim-buying spree with the specific intent to vote those acquired claims to reject the Plan and prevent confirmation." The evidence before the Court is that in September of 2014 the Bank provided the Debtor with drafts of new loan documents which were standard documents containing typical loan terms. The Debtor responded by proposing revisions to the new loan documents, which eliminated a number of standard obligations and provisions, and which the Bank found to be unacceptable. Negotiations broke down and the parties did not agree on new loan documents. While it may be true that the Bank sought to dictate the terms of the new loan documents, that, standing alone, is not bad faith.

The Debtor also contends that the Bank's existing loan documents are adequate and the Bank is not entitled to new loan documents. Debtor argues that the adequacy of the Bank's existing loan documents is demonstrated by the fact that the Bank extended the loan twice in 2013 despite the fact that the occupancy at the Property was only 56%, the Debtor was delinquent on property taxes, and the Debtor had missed months of interest only payments. However, Mr. Coates explained that while the Bank could have commenced a foreclosure proceeding at that time, it chose to work with the Debtor to

enable it to get back on its feet and maintain its operation. The Bank's pre-petition forbearance does not undermine its argument that the failure to obtain new loan documents would be detrimental to the Bank. Mr. Coates' unrebutted testimony established that the Bank's failure to obtain new loan documents would adversely affect its balance sheet through the term of the Plan. And, to ensure that the Debtor would not attempt to confirm the Plan over the Bank's objection in the event the parties were unable to agree on new loan documents, the Bank purchased the TIB Claim. The Court finds that the Debtor failed to prove that the Bank acted in bad faith in purchasing the TIB claim and voting to reject the Plan and that the Bank instead acted to protect its secured claim. Accordingly, the Court will not designate and disqualify the Bank's ballots.

## II.    Debtor's Objection to the Bank's Claim

### Pre-Petition Claim

The Debtor acknowledged in the Cash Collateral Orders that the Bank has a pre-petition claim in the amount of $850,054.38, consisting of $763,507.40 of principal, $42,481.98 of interest, $2,950.00 of appraisal costs, and $41,116.38 of attorney's fees and expenses. But, the Debtor now seeks to have the Court revisit the Cash Collateral Orders on the basis that the Bank breached the Orders and the Debtor's agreement to the Pre-Petition Claim was premised upon an agreement with the Bank for the treatment of the Bank's allowed Class 3 claim. The Debtor contends that the Bank has not submitted any evidence as to the pre-petition attorney's fees of $41,116.38 and they should therefore be disallowed. The Court finds that the bank did not breach or otherwise violate the Cash Collateral Orders and finds it inappropriate to revisit them. The Debtor waived its right to contest the allowance of the pre-petition attorney's fees and is therefore estopped from

now doing so. The Bank has a pre-petition secured claim in the amount of $850,054.38.

**Post-Petition Claim**

The Debtor asserts that the Bank is entitled to a post-petition claim in the amount of $39,174.88 as of January 31, 2015, calculated by reducing the $55,352.88 of post-petition interest (represented by $238.59 per day from the Petition Date through January 31, 2015) by $16,178.00 in loan payments made by the Debtor. The Bank asserts it is entitled to a post-petition claim in the amount of $149,674.24 through December 8, 2014, calculated by adding $42,469.02 of post-petition interest (represented by $238.59 per day from the Petition Date through December 8, 2014) and attorney's fees of $118,377.22 and reducing that amount by $11,172.00 in adequate protection payments.

The parties' dispute primarily revolves around the Bank's claim of $118,377.22 in post-petition attorney's fees. Initially, the Debtor contends that the Bank is not entitled to post-petition attorney's fees because, while the Note contained a specific provision for the recovery of the Bank's attorney's fees in the event of a bankruptcy, the "2013 extension" does not contain such a provision. Paragraph 4 of the November, 2013 modification agreement is entitled "Modification of the Note," provides that "[t]he section of the Note entitled 'Payments' is hereby deleted and replaced as follows" and contains information regarding the amount and due dates of payments. (Bank's Ex. 18, Ex. Q). Paragraph 14 of the November, 2013 modification agreement is entitled "Survival" and provides that "[e]xcept as expressly set forth herein, nothing contained in this Agreement shall constitute a waiver of any rights or remedies of [the Bank] under the terms of the Loan Documents." (Id.) Paragraph 15 of the November, 2013 modification agreement is entitled "No Novation" and provides that "[MRI, Inc.], [the Debtor], and [the Bank]

11

hereby acknowledge and agree that this Agreement shall not constitute a novation of the indebtedness evidenced and/or secured by the Loan Documents, and further that the terms and provisions of the Loan Documents shall remain valid and in full force and effect except as may be herein modified and amended." (Id.) The Court finds that the Bank did not waive its right to recover attorney's fees in the event of a bankruptcy by virtue of the November, 2013 modification agreement.

Because the Bank's claim is over-secured, § 506(b) provides that it includes post-petition interest and "reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506. The Congressional intent behind the enactment of § 506(b) "was to ensure that oversecured creditors do not lose their reasonable claims for attorneys' fees simply due to the fact that their collateral is worth more than the underlying claim-rather than [to serve] as a blank check for oversecureds to accrue legal fees beyond the scope of protecting their interest ..." In re Reorganized Lake Diamond Assocs., LLC, 367 B.R. 858, 867 (Bankr. M.D. Fla. 2007).

> In making a fee determination, the Court must consider not only the fee agreement but the overall fairness and reasonableness of the fee under all of the circumstances. Reasonable fees are those necessary to the collection and protection of a creditor's claim and include fees for those actions which a similarly situated creditor might have taken. The fees must be cost justified by the economics of the situation and necessary to preserve the creditor's interest in light of the legal issues involved. A secured creditor is not entitled to compensation for its attorney's fees for every action it takes by claiming that its rights have been effected.

Id. (quoting In re Digital Prods. Corp., 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997)).

The Debtor contends that the Bank should not be permitted to collect fees related to the failed negotiation of new loan documents or fees that "it needlessly incurred in pursuing

12

its bad faith scheme and attempting to coerce the Debtor into submission" where the value of the Property assured the Bank that it would be paid in full. The Bank points out that it incurred significant fees: 1) because of the Debtor's flip flopping position on whether the Bank has a secured claim; and 2) preparing acceptable new loan documents and thereafter taking actions to prevent the Debtor from confirming a plan without executing acceptable new loan documents. Upon a review of the entirety of the actions taken in this case, the Court finds that the Bank's fees, while significant relative to the principal amount of the underlying debt, are reasonable to protect the Bank's interests. The Bank's position that the only circumstance under which it would agree to confirmation of the Debtor's Plan was if the Debtor agreed to execute new loan documents which were acceptable to the Bank was made clear from the beginning of the case. As the Court previously noted in its discussion regarding the designation of the Bank's ballots, Mr. Coates testified that the failure to obtain new loan documents would adversely affect the Bank's balance sheet through the term of the Plan. The Court finds that the fees incurred by the Bank were necessary to the collection and protection of its claim. The Court will overrule the Objection to Claim. The Bank's secured claim as of December 8, 2014 is $999,728.62.

### III. Confirmation

Section 1129 of the Bankruptcy Code provides that a court shall confirm a Chapter 11 plan if it complies with each of the requirements set forth therein. The Debtor has the burden of proving by a preponderance of the evidence each of the elements of § 1129. In re J.C. Householder Land Trust, 501 B.R. 441, 448 (Bankr. M.D. Fla. 2013). The Bank argues that the Court should not confirm the Plan because it does not comply with §§ 1129(a)(1), 1129(a)(3), 1129(a)(7), 1129(a)(8), and 1129(a)(11). The Court will address

13

the Bank's arguments in turn.

### The Plan Does Not Comply with § 1129(a)(1)

Section 1129(a)(1) requires that a plan comply with the applicable provisions of the Bankruptcy Code. The Bank contends that the Plan does not comply with § 507 of the Bankruptcy Code because it proposes to treat $12,475.00 of Guardian's $17,752.00 claim as an administrative expense claim pursuant to § 507(a)(4). Section 507(a)(4) grants administrative expense status of up to $12,475.00 of an otherwise unsecured claim of a corporate creditor like Guardian for sales commissions only if (i) the corporation has one employee and (ii) at least 75% of the corporation's earnings in the 12 months preceding the debtor's petition date were earned from the debtor. 11 U.S.C. § 507(a)(4)(A) and (B). The Debtor did not offer any evidence that 75% of Guardian's earnings in the year preceding the Petition Date were from the Debtor. To the contrary, Robert Ascher, Guardian's president, testified that only 10% of Guardian's business was from the Debtor. (Tr. at 72-73). Accordingly, the Plan does not comply with § 507.

The Bank also argues that the Plan does not comply with § 1122 because it separately classifies substantially similar claims, namely Guardian's Class 4 unsecured claim and the TIB Class 5 unsecured claim. A plan proponent has considerable but not unlimited discretion to classify claims and interests according to the facts and circumstances of the case. In re Holywell Corp., 913 F.2d 873, 880 (11th Cir. 1990). Absent some limit on a debtor's power to classify creditors, the potential for abuse would be significant. Id. (citation omitted). Section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122. While the Code

14

does not address whether all substantially similar claims must be placed in the same class, courts have held that separate classification of similar claims must be supported by a legitimate business reason. In re Porcelli, 319 B.R. 8, 10 (Bankr. M.D. Fla. 2004); In re Main Line Corp., 335 B.R. 476, 479 (Bankr. S.D. Fla. 2005). One clear rule emerges from the case law on claims classification; "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991); see also Porcelli, 319 B.R. at 10 (noting that plan proponent must demonstrate classification scheme not motivated by purpose of gerrymandering affirmative vote of impaired class).

Mr. Foster testified that the Plan classified and treated Guardian as it did because Guardian is a necessary participant in the success of the Plan, the Debtor must have a good relationship with the real estate brokerage community, and the Debtor would not have a good reputation in that community if it did not pay the commissions. (Tr. at 37-38). The Debtor's justification for making a nominal payment on the TIB Claim was that (i) the TIB Claim was based on a credit card personally guaranteed by Henry Dean and Thomas Dean and (ii) TIB, as the initial holder of the TIB Claim, had not expressed an interest in settlement because it intended to seek repayment from the guarantors and did not want to get involved in "messy" bankruptcy negotiations. (Tr. at 39-40).

The Court finds that the Debtor did not establish a legitimate business reason for separately classifying the claims of Guardian and TIB. Mr. Coates testified that there is a broad market in Jacksonville for real estate brokers, and there are many brokers qualified to lease the Property. The Court rejects the Debtor's argument that not separately classifying Guardian will preclude it from finding brokers to assist it in obtaining tenants.

15

Nor is the fact that Henry and Thomas Dean guaranteed the TIB Claim justification for separately classifying it. First, the evidence established that the Deans have very little capacity to repay any debt, calling into question the value of the guarantees. But, even if the Deans are viable repayment sources, the Court agrees with the majority of courts which hold that "the existence of a personal guarantee, alone, is not a sufficient basis to find that an unsecured deficiency claim is not substantially similar to other unsecured creditors." In re 18 RVC, LLC, 485 B.R. 492, 497 (Bankr. E.D.N.Y. 2012).

The Court finds that the Debtor's attempt to cloak Guardian with administrative expense status and to separately classify Guardian's residual unsecured claim from the TIB Claim is for the sole purpose of gerrymandering an accepting impaired class of votes and violates § 1122. If the TIB Claim were, as required by §1122, classified with Guardian's unsecured claim, the Plan would not have an accepting impaired class as required by § 1129(a)(10).[3] The Court finds that the Plan does not comply with § 1129(a)(1).

### The Plan Complies with § 1129(a)(3)

Section 1129(a)(3) requires a plan to be proposed in good faith and not by any means forbidden by law. As the Court previously noted in its discussion regarding the designation of the Bank's ballots, good faith is not defined in the Bankruptcy Code. A plan's good faith is determined by considering the totality of the circumstances. In re Proud Mary Marina Corp., 338 B.R. 114, 123 (Bankr. M.D. Fla. 2006). In reviewing the totality of the circumstances, courts focus on the plan and the plan's ability to achieve the

---

[3] Section 1129(a)(10) provides that if there is an impaired class of claims under a plan, at least one impaired class must accept the plan.

16

objectives of the Bankruptcy Code. Id. (citing In re Bravo Enters., 331 B.R. 459, 472 (Bankr. M.D. Fla. 2005)). The Bank asserts the Plan does not promote the objectives and purposes of the Bankruptcy Code because the Plan's unstated purpose is to avoid a significant tax liability the Debtor will incur if the Property is sold or foreclosed. The Debtor concedes there would be significant tax consequences if the property were sold. However, it points to its increased occupancy rate (from 56% in 2013 to 83% at the time of the confirmation hearing) as evidence that it desires to remain open and continue to operate. The Court finds that the Plan was proposed in good faith.

### **The Plan Does not Comply with § 1129(a)(7)**

Section 1129(a)(7) establishes the "best interests of creditors" test and requires:

> With respect to each impaired class of claims or interests –
> (A)     each holder of a claim or interest of such class –
> (i)     has accepted the plan; or
> (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7). The plan proponent must prove that each rejecting claimant in an impaired class will receive no less in the Chapter 11 than the claimant would have received if the debtor were liquidated in Chapter 7. The Bank holds two impaired claims and has not accepted the Plan. Accordingly, to meet the requirements of § 1129(a)(7), the Debtor must prove that the Plan will provide the Bank with property of a value, as of the Plan's effective date, that is not less than the amount the Bank would receive if the Debtor were liquidated

17

in Chapter 7.[4] Mr. Foster agreed that the Property is worth at least $1.4 million but testified that if the Property were liquidated in a Chapter 7, the sales price would be a fraction of that amount and there is a good likelihood the Bank would not be paid in full and none of the other claimants would be paid. (Tr. at 45-47). Mr. Foster's Chapter 7 liquidation analysis based upon his off the cuff estimation of the price the Property would sell for in a Chapter 7 liquidation does not satisfy § 1129(a)(7). See In re Smith, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006)("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.") Specifically, Mr. Foster's testimony does not establish that if the Debtor had filed its case under Chapter 7, the proceeds from the sale of the Property would not pay all of the Debtor's creditors in full. The Plan, however, does not propose to pay the Debtor's secured or unsecured creditors in full. (Bank's Ex. 3, §§ 3.3a - 3.3c). The Debtor did not prove by a preponderance of the evidence that the Bank will receive or retain property of a value that is not less than the amount the Bank would receive if the Debtor were liquidated under Chapter 7.

### The Plan does not Comply with § 1129(a)(8)

Section 1129(a)(8) requires that, with respect to each class of claims, each class has accepted the plan or the class is not impaired under the plan. The Bank's claims

---

[4] The Debtor asserts that the best interests of creditors test does not apply here because the Bank is a "bad actor[] seeking to subvert the bankruptcy process to [its] own designs." (Doc. 57 at 15). Specifically, the Debtor points out that the Bank is secured creditor, who despite being paid in full under the Plan, voluntarily paid $21,000.00 for a claim that was to receive a $500.00 payout and now seeks to prevent confirmation. As the Court has already determined that the Bank acted in its self interest in protecting its secured claim when it purchased the TIB Claim, the Court rejects the Debtor's argument that the best interests of creditors test does not apply.

18

under Class 3 and under Class 5 are impaired. (Bank's Ex. 3, §§ 3.3a - 3.3c). The Bank's claims under Class 3 and Class 5 are the only claims in such classes and the Bank rejected the Plan with respect to each claim. The Plan therefore does not comply with § 1129(a)(8).

### Section 1129(a)(11).

Section 1129(a)(11), the "feasibility" requirement, mandates that the court confirm a plan only if "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ..." 11 U.S.C. § 1129(a)(11). Section 1129(a)(11) is designed "to prevent confirmation of 'visionary schemes' that promise a greater distribution than the debtor or plan proponent could ever attain." In re Bravo Enters. USA, LLC, 331 B.R. 459, 474 (Bankr. M.D. Fla. 2005). "The bankruptcy court is only required to find that a plan offers a reasonable probability of success, and a plan may be confirmable even if the debtor's projections are aggressive and do not view all business prospects in the worst possible light." In re F.G. Metals, Inc., 390 B.R. 467, 476 (Bankr. M.D. Fla. 2008) (citing In re T-H New Orleans Limited P'ship, 116 F.3d 790, 801-802 (5th Cir. 1997)). "The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 762 (Bankr. S.D. N.Y. 1992). In close cases, the better approach is to give the debtor an opportunity to demonstrate feasibility by performance. See In re Gelin, 437 B.R. 435, 438 n.9 (Bankr. M.D. Fla. 2010). In light of the fact that the Bank's secured claim as of the date of the confirmation hearing was $999,728.62 rather than the $910.177.60 provided for in the Plan, the Court is unable to determine whether the Plan is feasible.

**Section 1129(b)**

Section 1129(b) provides conditions under which a plan may be confirmed if all of the applicable provisions of § 1129(a), other than § 1129(a)(8), are met. However, because the Court finds that the Plan also fails to meet the requirements of §§ 1129(a)(1) and 1129(a)(7), the Court need not address § 1129(b).

**Conclusion**

The Court finds that the Debtor failed to prove that the Bank acted in bad faith in purchasing the TIB Claim and voting to reject the Plan and that the Bank instead acted to protect its secured claim. Accordingly, the Court will not designate and disqualify the Bank's ballots from being tabulated for purposes of confirmation. The Court finds that the attorney's fees incurred by the Bank were necessary to the collection and protection of its claim and will therefore overrule the Objection to Claim. Because the Plan does not comply with all of the requirements of § 1129, the Court will deny confirmation of the Plan. The Court will enter separate orders consistent with these Findings of Fact and Conclusions of Law.

**DATED** this 6 day of March, 2015 at Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge